**CATLIN (SYNDICATE 2003) at LLOYD'S, Plaintiff,**

v.

**SAN JUAN TOWING & MARINE SERVICES, INC., Defendant.**

Civil Nos. 11–2093 (FAB), 11–2116(FAB).

United States District Court, D. Puerto Rico.

Oct. 8, 2013.

Marco A. Gonzalez, Jr., James W. Carbin, Ryan McElduff, Duane Morris, LLP, Newark, NJ, for Plaintiff.

Manuel Sosa–Baez, Luis N. Saldana–Roman, Ian P. Carvajal–Zarabozo, Saldana, Carvajal & Velez–Rive, Psc., San Juan, PR, for Defendant.

## MEMORANDUM, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

BESOSA, District Judge.

This case was tried before the Court without a jury between August 12th and August 15th, 2013. Plaintiff Catlin (Syndicate 2003) at Lloyd's ("Catlin") and defendant San Juan Towing & Marine Services, Inc. ("SJT") subsequently submitted proposed findings of fact and conclusions of law. (Docket Nos. 185 & 184, respectively.) Upon consideration of the evidence presented at trial, post-trial memoranda, and the entire record in the case, the Court makes the following findings of fact and conclusions of law pursuant to Fed. R.Civ.P. 52.

## I. Findings of Fact [1]

On August 27, 2006, SJT—a Puerto Rico corporation in the ship repair business based in San Juan—purchased a floating drydock called the *Perseverence* for $1.05 million. (Docket Nos. 79 at p. 1; 81 at p. 1; 134–1 at p. 1; 139 at p. 1.) In 2009, SJT put the *Perseverence* up for sale for $1.35 million "because there was no business" for it. (Docket Nos. 134–1 at p. 3; 139 at p. 2; Trial Ex. 218, p. 104.) In February 2010, SJT advertised the drydock for sale in *Boats & Harbors*—a marine industry publication—for $1.35 million. (Trial Exs. 6 & 218, p. 104.) In January 2011, SJT continued to advertise the *Perseverence* for sale for $1.35 million in *Boats & Harbors*. *Id.* at Exs. 11 & 18.

On January 3, 2011, the Hendry Corporation of Tampa, Florida offered to purchase the drydock for $700,000. *Id.* at Ex. 5. Mr. Payne, the head of SJT, reported the offer to Banco Popular de Puerto Rico ("Banco Popular") [2], stating, notwithstanding having advertised the drydock for sale for $1.35 million, "The original cost for the dry dock was about [$]1,100,000 four years ago. It seems to me that the [$700,000] offer I am attaching is very close to reality." *Id.* Over the course of that month, SJT and Hendry bargained over the selling price of the *Perseverence:* On January 21, 2011, SJT offered to sell the drydock for $850,000; Hendry responded to SJT's counteroffer that same day with a $775,000 offer; and on January 29, 2011, SJT offered to sell the drydock for $800,000. (Docket Nos. 134–1 at p. 5, 139 at pp. 2–3; Trial Exs. 12 & 13.) Hendry did not ultimately purchase the *Perseverence.*

In April 2011, after obtaining Banco Popular's approval, SJT again advertised the *Perseverence* for sale in *Boats & Harbors*, this time for $800,000. (Docket Nos. 134–1 at p. 6; 139 at p. 3; Trial Exs. 9 & 218, pp. 115–16.) On May 17, 2011, SJT advised Damco Marine Management, Inc. that the drydock was still for sale for

---

**1.** The Court does not rehash the entire trial or previous factual findings here. In addition to the findings in this memorandum, the Court adopts and incorporates all findings of fact contained in its previous orders, including *Catlin v. San Juan Towing & Marine Servs.,* 2013 WL 1403264, 2013 U.S. Dist. LEXIS 52307 (D.P.R. Apr. 8, 2013) and *Catlin v. San Juan Towing & Marine Servs.,* 974 F.Supp.2d 64, 2013 WL 3943521, 2013 U.S. Dist. LEXIS 108935 (D.P.R. July 30, 2013).

**2.** SJT had obtained a line of credit from Banco Popular to pay for the drydock. (Docket Nos. 134–1 at p. 2; 139 at p. 1.) Mr. Payne was required to obtain Banco Popular's agreement for the sale of the drydock, because it would have constituted a "short sale." (Trial Ex. 218 at p. 109.)

$800,000. (Docket Nos. 134–1 at p. 10; 139 at p. 5.) On June 5, 2011, Mr. Richard Ortego—the Vice President and General Manager of Repair at Leevac Shipyards, LLC—traveled to Puerto Rico to inspect the drydock. (Docket Nos. 137 at pp. 2–3; 141 at p. 5.) After examining the drydock's general conditions, Mr. Ortega determined that the drydock was "suitable for purchase." (Docket Nos. 137 at p. 4; 141 at pp. 6–10.) On or around September 4, 2011, SJT agreed to sell the *Perseverence* to Leevac, (Docket 81–16 at p. 7), and on September 19, 2011, when Mr. Payne signed a purchase and sale agreement, SJT accepted Leevac's offer to purchase the drydock for $700,000. (Docket Nos. 134–1 at p. 10; 139 at p. 5.)

From 2006 to 2011, SJT insured the drydock with RLI Insurance Company ("RLI"). (Docket Nos. 134–1 at p. 5; 139 at p. 3.) The drydock's value when RLI first underwrote the policy was determined through a condition and valuation survey performed by Marine Consultants, Inc. (Docket Nos. 139 at p. 9; 147 at p. 1.) The value of the drydock according to the survey, and later reflected in RLI's policy, was $1.75 million.[3] *Id.* Mr. John Kirchhofer was RLI's underwriter who handled SJT's account up until he left to work as a marine underwriter for Catlin in January 2011. (Docket Nos. 139 at p. 10; 134–1 at p. 6; 139 at p. 3; 147 at p. 3.) A month after Mr. Kirchhofer left RLI, RLI advised SJT that it was canceling its insurance policy mid-term. (Docket Nos. 134–1 at 5; 139 at 3.) Five days later, RLI issued a Notice of Cancellation/Nonrenewal, citing "Loss History" as the reason for canceling the policy. *Id.*

In February or March of 2011, Mr. Toscani, an insurance broker for SJT, called Mr. Kirchhofer to explain that RLI was going to drop its insurance coverage of the *Perseverence,* and to ask whether Mr. Kirchhofer would be interested in creating a quote for Catlin because he was familiar with the account. (Docket 134–1 at Ex. 12, pp. 20–30; Trial Ex. 217, pp. 30–32; Docket 178 at p. 70.) Mr. Toscani told Mr. Kirchhofer that the drydock was up for sale and was non-operational at that time. (Trial Ex. 217, pp. 34 & 39.) He claims to have first learned that the drydock was up for sale "approximately six months" prior to securing an insurance policy with Catlin; he denies, however, that he ever learned SJT's asking price for the *Perseverence.* *Id.* at 44–45. Had Mr. Toscani been aware of the market value of the drydock, he would have disclosed it to Catlin, because the information would have been material to the insurance risk. *Id.* at 55–57.

On April 12, 2011, Mr. Toscani e-mailed Mr. Kirchhofer about Catlin's insurance quote. (Docket 134–1 at Ex. 18.) Mr. Toscani's email was a typical marine risk "submission," which is a request from a broker to an underwriter for a coverage quote for a particular risk. (Docket 178 at pp. 70, 75–76.) The e-mail advised that the drydock was "currently up for sale" and included a copy of the "SRLL/CGL Hull P & I policy" with RLI, which listed the *Perseverence*'s value at $1.75 million.[4]

---

3. The *Perseverence*'s value increased from the original purchase price paid by SJT because SJT made several modifications to the drydock.

4. Mr. Toscani did not provide Catlin with a copy of RLI's notice of cancellation, but he claims to have told Mr. Kirchhofer that the reasons RLI wanted to cancel the account were twofold: (1) RLI was not interested in the drydock business anymore, and (2) the losses sustained by the drydock and paid out by RLI exceeded the amount of premiums SJT was paying, such that there was a "high loss ratio" on the account. (Trial Ex. 217, pp. 39, 90–92.) Mr. Kirchhofer denies that Mr. Toscani informed him that RLI cancelled the policy for loss history; he instead claims to

(Trial Ex. 19.) Mr. Kirchhofer testified that Mr. Toscani gave no affirmative indication as to the drydock's value or condition during their discussions regarding SJT's insurance application to Catlin. (Docket 178 at pp. 72.) He admitted, however, that he did not ask for that information because "the broker and the insured have a duty of utmost good faith to disclose any material information regarding the risk." *Id.* In the absence of any disclosure of information regarding the drydock's condition by the insured or the broker, Mr. Kirchhofer "assumed[,] and it was implied[,] that there was no serious issue with the condition of the drydock." *Id.* Mr. Kirchhofer also explained that, although he was aware that the drydock was for sale, he was not informed of the selling price and "assumed that the selling price was in line [with] the insured value." (Docket 178 at p. 78.) From his communications with Mr. Toscani, Mr. Kirchhofer understood that Catlin would be underwriting a drydock that was up for sale, a port risk, and nonoperational. *Id.* at 99–100. Because those circumstances represent "a lesser risk to underwriters," Mr. Kirchhofer did not believe there was any "cause of alarm" to order a condition and valuation survey of the drydock. *Id.* at 99–100, 115. On April 18, 2011, Mr. Kirchhofer sent Catlin's marine coverage quote to Mr. Toscani via e-mail, and SJT accepted Catlin's quote on April 25, 2011. (Docket Nos. 134–1 at Ex. 19; 134–1 at p. 9; 139 at p. 4.) The Ocean Marine Insurance Policy No. HLO–3464–0411 ("the Policy") became effective on April 29, 2011. (Docket 50–1.)

Mr. Kirchhofer testified that Catlin never received any request from SJT to

change the value of coverage for the *Perseverence* from the $1.75 million amount originally provided. (Docket 178 at p. 84.) He stated that no one informed him of the $1.35 million asking price contained in the Boats & Harbors February 3, 2010 advertisement, and that he did not become aware of that information until after this litigation had begun. *Id.* at 88–89. He testified that he "was surprised [about the $1.35 million asking price,] because that was not in line with what we were insuring the dry-dock for." *Id.* at 90. It was also not until the lawsuit that Mr. Kirchhofer became aware of the Hendry Corporation's January 2011 offer to purchase the drydock for $775,000; SJT's counter-offer for $800,000; or Mr. Payne's representation to Banco Popular that the $775,000 offer from Henry Corporation was "very close to reality." *Id.* at 90–94. Mr. Kirchhofer also was not told that the drydock was being advertised for $800,000 in the April 2011 issue of Boats & Harbors. *Id.* at 91–92. He explained that the advertising price of "over half the difference in insured value" would be important to Catlin because "the purpose of the insurance is to insure at a fair market value, to prevent the insured from profiting from his insurance." *Id.* at 92–95. Mr. Kirchhofer opined that because SJT had made representations to the public marketplace and to its bank that the *Perseverence*'s value was much less than $1.75 million, the insured should also have notified its insurance broker and underwriter of that information. *Id.* at 96–97. To Catlin, the overrepresentation of the *Perseverence*'s value served as an additional reason for rescinding the Policy. *Id.* at 95.

have first learned that information at his deposition for this case. (Docket 178 at pp. 100–03.) Mr. Kirchhofer did know from his previous experience at RLI, however, that

RLI's business model had indeed changed to focus on recreational-type business accounts instead of commercial ones. *Id.* at 71–72.

At the end of September 2011, Mr. Toscani contacted Mr. Kirchhofer to notify him of the drydock's sinking. Mr. Kirchhofer forwarded the claim to Mr. John Competiello, a marine claims manager at Catlin, who contacted a surveying company called GL Noble Denton to examine the claim. (Docket 178 at pp. 106–07.) Noble Denton investigated the drydock, took photographs of the drydock, issued "advices" or reports to Mr. Competiello, and ultimately advised Catlin (1) that the *Perseverence* was in poor condition, (2) that significant deterioration and corrosion of the structure had occurred, and (3) that the corrosion had existed for a significant period of time. (Docket 178 at pp. 109–10; Trial Exs. 98, 163–176.) The pictures demonstrated to Mr. Kirchhofer that the drydock had "such significant corrosion that there [were] gaping gaps in the plating," (Docket 178 at p. 111), which in turn indicated long term—not short term—corrosion. This led Mr. Kirchhofer to conclude that SJT should have disclosed the level of corrosion "at the time of binding or at some point during the policy period," and ultimately Catlin chose to rescind the Policy and return the premiums. *Id.* at 109–10.

## II. Conclusions of Law: *Uberrimae Fidei*

■ The Court previously held that the maritime doctrine of *uberrimae fidei* applies to the marine insurance policy in this case. *See Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs.,* 974 F.Supp.2d 64, 2013 WL 3943521, 2013 U.S. Dist. LEXIS 108935 (D.P.R. July 30, 2013) (Besosa, J.). *Uberrimae fidei* implicates two distinct but closely related aspects: non-disclosure and misrepresentation. Thomas J. Schoenbaum, 2 ADMIRALTY & MAR. LAW § 19–14 (5th ed.) at p. 408. Premised on the belief that the "assured is in the best position to know of any circumstances material to the risk [and] must reveal those facts to the underwriter," *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 13 (2d Cir.1986), "the strict maritime rule of *uberrimae fidei* [provides that] an insured must make full disclosure of all material facts of which the insured has, or ought to have, knowledge … even though no inquiry be made." *Grande v. St. Paul Fire & Marine Ins. Co.,* 436 F.3d 277, 283 (1st Cir.2006) (internal quotations and citations omitted). When the insured fails to disclose to the insurer all circumstances known to it and unknown to the insurer, which materially affect the risk, the policy is voidable at the option of the innocent party. *King v. Aetna Ins. Co.,* 54 F.2d 253, 254 (2d Cir.1931). That is also true for a material misrepresentation by the insured. *Albany Ins. Co. v. Wisniewski,* 579 F.Supp. 1004, 1015 (D.R.I.1984) (Selya, J.). The duty of utmost good faith thus saddles the assured with a high burden. Schoenbaum, § 19–14 at p. 412.

■ It is of no consequence whether the insured's misrepresentation or non-disclosure occurred "due to fraud, negligence, accident, or mistake." Schoenbaum, § 19–14 at p. 412; *see also Wisniewski,* 579 F.Supp. at 1015 ("If a policy of marine insurance is issued upon false and material representations, the absence of fraud or of an intent to deceive will not save the contract from rescission."). This is because the insured has a duty "to place the underwriter in the same situation as himself [and] to give to him the same means and opportunity of judging of the value of the risks." *Sun Mut. Ins. Co. v. Ocean Ins. Co.,* 107 U.S. 485, 510–511, 1 S.Ct. 582, 27 L.Ed. 337 (1883). "[W]hen any circumstance is withheld, however slight and immaterial it may have seemed to himself, that, if disclosed, would probably have influenced the terms of the insurance, the concealment vitiates the policy." *Id.*

■ As the Court previously warned, "if the Court determines that SJT—whether fraudulently, negligently, accidentally, or by mistake—overstated the *Perseverence*'s value and/or concealed material information regarding the subject matter of the risk while seeking insurance coverage from Catlin, the Policy will be void *ab initio.*" *Catlin*, 974 F.Supp.2d at 79, 2013 WL 3943521 at 8, 2013 U.S. Dist. LEXIS 108935 at 33–34. Because the Court indeed finds that SJT (1) overstated the value of the *Perseverence,* and (2) failed to disclose an accurate description of the drydock's condition where applying for insurance from Catlin, the Court holds that a violation of *uberrimae fidei* occurred and that the marine insurance policy is void *ab initio.*

## A. Misrepresentation of the *Perseverence*'s Value

SJT unquestionably overstated the drydock's value when it sought insurance coverage from Catlin in April 2011. Mr. Toscani's insurance submission[5] to Catlin included a prior RLI policy that explicitly valued the *Perseverence* at $1.75 million.[6] (Trial Ex. 19.) Mr. Kirchhofer explained that although Mr. Toscani informed him that the drydock was for sale in April 2011, Mr. Kirchhofer was not told the selling price and "assumed that the selling price was in line [with] the insured value." (Docket 178 at p. 78.) Given that Mr. Toscani made no additional representations to Mr. Kirchhofer regarding the *Perseverence*'s value, SJT's submission represented to the insurance underwriter that the drydock was still worth $1.75 million. Catlin reasonably concluded that SJT sought insurance for a $1.75 million drydock, therefore, and relied on that information to fashion the Policy. For more than a year, however, SJT had represented to the public that the drydock was worth *significantly less* than $1.75 million. From 2009 through January 2011, SJT's asking price for the *Perseverence* was $1.35 million, as advertised in *Boats & Harbors.* In January 2011, SJT negotiated the sale price with the Hendry Corporation, demonstrating that it would accept $800,000 for the drydock. Then, in April 2011—the same month in which it sought insurance coverage from Catlin—SJT advertised the drydock in *Boats & Harbors* for $800,000.

SJT would have the Court believe that the prices as advertised in *Boats & Harbors* do not reflect the drydock's fair market value at the Policy's inception because SJT was not a "willing seller."[7] (Docket

5. Catlin does not have any kind of standard written application form that must be completed for marine insurance risks; instead, Catlin accepts broker "submissions," as it did here. (Docket 178 at p. 76.)

6. The $1.75 million value in the RLI policy was based on a condition and valuation report conducted on the *Perseverence* in 2006. Mr. Kirchhofer testified that a condition and valuation survey may be used to determine fair market value of a marine structure. (Docket 178 at p. 119.) Thus, by including RLI's policy as part of SJT's submission to Catlin, SJT was representing that the fair market value of the drydock was still $1.75 million. Given Mr. Kirchhofer's familiarity with the drydock's history of loss and claims

at RLI, however, the Court finds Mr. Kirchhofer's acceptance of that $1.75 million value in the April 2011 submission bewildering.

7. SJT cites *United States v. E. S.S. Lines, Inc.,* 171 F.2d 589 (1st Cir.1948) for the proposition that "fair market value" is determined by what a willing seller would take and a willing buyer would give in a free and open market. (Docket 184 at p. 52.) After consulting additional Supreme Court and First Circuit Court of Appeals cases discussing fair market value in other contexts, the Court subscribes to the *E. S.S. Lines* definition, with the *caveat* that the concept also involves a willing buyer and seller *who are not under any compulsion to buy or to sell* and who both have reasonable knowledge of the facts. *See, e.g., United*

140 at p. 9.) The record, however, belies that assertion. In his deposition, Mr. Payne agreed that SJT's offer to sell the drydock at $800,000 was calculated in order "to get what the market would give." (Trial Ex. 218, p. 114.) Moreover, Mr. Payne acknowledged to his bank in writing that a $775,000 offer is "very close to reality," indicating that SJT believed the *Perseverence*'s market value was close to $775,000—not $1.75 million. Mr. Payne understood from Mr. Raymond's inspection that the *Perseverence* was in need of internal steel repairs in January 2011, (Trial Ex. 218 at pp. 113–15; Trial Ex. 13), and SJT subsequently decided to drop the asking price to $800,000 in the *Boats & Harbors* April 2011 publication, which together indicate SJT's acknowledgment that the drydock's $1.35 million asking

*States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (U.S.1973) ("The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."); *Worcester Cnty. Trust Co. v. Commissioner*, 134 F.2d 578, 582 (1st Cir.1943) (same).

SJT presents no evidence that it was "compelled" to sell the *Perseverence* such that it was an unwilling seller under the above standard. It merely claims that because "there was no business" for the drydock, SJT had to sell it. SJT fails to provide supporting case law-and upon independent review the Court finds none—indicating that a lack of business for an object's use constitutes a reason to find that the seller of the object was "compelled" to engage in its sale. Accordingly, the Court declines to find that simply because SJT wanted to sell the drydock due to a lack of drydocking business, SJT was not a willing seller. To the contrary, the record clearly shows that SJT had the power to negotiate and bargain over the *Perseverence*'s selling price, and retained and exercised the power to reject and select the *Perseverence*'s ultimate buyer-circumstances inherent to free market participation.

price was off the mark. Furthermore, Mr. Payne ultimately signed a purchase and sale agreement with Leevac Shipyards in September 2011 to sell the drydock for $700,000. (Docket 81–16 at p. 7.)

An insured's representations about the true value of the object to be insured directly pertains to the subject matter of the risk, and both Mr. Toscani and Mr. Kirchhofer testified that an accurate value of the drydock was material to Catlin's determination of risk when issuing SJT's Policy. Because SJT recognized the *Perseverence*'s fair market value as between $700,000 and $800,000 during the same month that it applied for $1.75 million coverage from Catlin, the Court finds that SJT misrepresented material information to Catlin by overstating the drydock's value.[8] "[O]verstating value is one of the

8. The Court does not go as far as finding that SJT also violated *uberrimae fidei* by not disclosing the sale price. The First Circuit Court of Appeals has recognized that the insured does not have to disclose material information that "the insurer already knows or ought to know." *Compagnie De Reassurance D'Ile De Fr. v. New Eng. Reinsurance Corp.*, 57 F.3d 56, 80 (1st Cir.1995) (citation omitted). "A minute disclosure of every material circumstance is not required. Ordinarily the insured is not required to make more than a general statement of facts, and is not expected to go into the details about which the insurer manifests no interest and makes no inquiry...." *Id.* (internal quotations and citations omitted). Before preparing SJT's quote, Mr. Kirchhofer was aware of the general fact that the drydock was for sale, but he manifested no interest in, and made no inquiry into, the selling price. SJT could not have been expected to go into detail about the asking price if Mr. Kirchhofer showed no interest in it. Keeping the nature of the required disclosure "within reasonable bounds," Schoenbaum, § 19–14 at p. 412, the Court does not conclude that SJT violated its *uberrimae fidei* duty by failing to disclose the advertised sale price. SJT's affirmative duty not to misrepresent the value of the drydock, however, is a distinct duty which SJT clearly violated when it over-valued the *Perseverence* in its submission.

most frequent subjects of breach of the duty of good faith," *Catlin,* 974 F.Supp.2d at 78, 2013 WL 3943521 at 8, 2013 U.S. Dist. LEXIS 108935 at 33, and therefore, SJT breached the doctrine of *uberrimae fidei.* As a result, the Policy is void *ab initio.*

## B. Concealment of the Drydock's Condition

The Court is also persuaded that SJT violated *uberrimae fidei* by failing to disclose an accurate description of the drydock's condition when seeking insurance from Catlin. Taken as a whole, the evidence in the record supports a conclusion that the drydock was in poor condition. Over 200 pictures show significant wastage—such as cracks, bent members, missing members, broken bulkheads, holes, barnacles, and corroded metal—on the drydock just after it sank. (Trial Exs. 53–162, 176–190.) Noble Denton's reports documented poor conditions on the drydock in September and October 2011: they reference the forward rake area and entire hull as being "heavily covered with barnacles"; they describe the main deck as being in "very poor condition"; and they inform of "buckling of plating" on the drydock's starboard forward end. (Trial Ex. 172.) Defendant's own expert, Mr. Camuccio, admitted to finding "a lot" of corrosion on the drydock: "[T]he metal was—the rust was flaking off. Some places it had fallen off. There was a substantial amount of deterioration." (Docket 181 at p. 46–48.)

Admittedly, the photographs, Noble Denton's reports, and Mr. Camuccio's inspection occurred after the drydock had sunk and had been underwater for 29 days. Mr. Payne contended that the wastage in the drydock "could be due to the drydock falling 20 feet, 400 tons," to the bottom of the ocean floor on the night of September 28, 2011, and he claimed that it was unclear whether the poor conditions existed before the drydock sank. (Trial Ex. 218 at p. 251.)[9] The Court finds credible the testimony of defendant's expert, Mr. Camuccio, that the amount of force from the sinking and impact with the ocean floor likely caused *some* damage to the drydock that subsequently required reinforcement repairs. (Docket 180 at pp. 56, 82–85.) Persuasive evidence suggests, however, that the *extensive* damage and *severe* level of corrosion on the drydock did not realistically occur from sinking a mere 20 feet and resting underwater for a relatively short amount of time. Mr. Payne himself admitted that wastage is a process that takes time to develop and does not occur overnight. (Trial Ex. 218 at p. 261.) Mr. Competiello also testified that after his conversations with Noble Denton, he understood that "the degree of wastage [on the drydock in September 2011] was existent and to such a point that it had been going on for a very long period of time...." (Docket 178 at p. 34.) Although Mr. Ortego's deposition suggests that the drydock was in relatively good condition such that it was "suitable for purchase" in June 2011, (Trial Ex. CCCC at pp. 13–16), the fact that Leevac ultimately contracted to purchase the drydock for a mere $700,000 leads the Court to conclude that the drydock was in substantially worse condition than it had been

9. Identifying cracks, bent members, missing members, broken bulkheads, holes, and corroded metal in pictures of the drydock, Mr. Payne attributed the drydock's wasted conditions to the accident, stating, "This thing sank and hit the bottom. Everything's all bent and broken." (Trial Ex. 218 at pp. 257, 259, 261, 272–73, 276–77.) "They are wasted, but I can't tell, you know, what came first, the chicken or the egg." (Trial Ex. 218 at p. 264.)

when Mr. Payne purchased it. (*See* Docket 178 at p. 184) (Marine Consultants, Inc. former surveyor, Mr. Jonathan Lipuscek, testifying that when he conducted a survey of the *Perseverence* in 2006, it was in "fairly good condition"). Indeed, Mr. Richard Thompson, a hull and machinery surveyor with CSL North America, testified that the "heavy wastage" and poor condition of the drydock's steel after the accident were "very similar" to the conditions that he found in his April 2010 inspection. Thus, it is reasonable to conclude that the drydock's poor condition due to wastage was present at the time SJT applied for insurance coverage with Catlin in April 2011, and that Mr. Payne knew it or should have known it.

Furthermore, SJT's lack of regular inspections or established policies to improve or prevent poor drydock conditions contributes to the conclusion that the wastage was long-standing. Mr. Payne admitted that between the time SJT purchased the drydock in 2006 and its sinking in 2011, SJT never conducted any inspection of the deck plating on the drydock. (Trial Ex. 218 at p. 252.) Mr. Camuccio explained that he asked Mr. Payne for a copy of SJT's maintenance plan for the drydock, and Mr. Payne indicated that no such thing existed. (Docket 181 at pp. 43–44.) Mr. Payne also admitted that SJT did not have a specific procedure for inspecting the drydock for corrosion; he claimed that SJT personnel like supervisors, welders, or himself would inspect the *Perseverence* roughly once a month, but they kept no notes, logs, or records regarding their alleged inspections. (Trial Ex. 218 at pp. 46–48.) Mr. Payne's general policy was merely to "look" with the naked eye at the *Perseverence* to see if there was corrosion and replace things if they appeared "broken." *Id.* at 54–55, 255. Several witnesses explained that rust and wastage is *not normal if the tanks are coated.*

(Docket Nos. 178 at pp. 177–78; 179 at p. 42.) Mr. Payne was aware that the *Perseverence* was "void of any internal coating to protect it from corrosion," but declined to coat the tanks after purchasing the *Perseverence* in 2006. (Trial Ex. 218 at p. 121.) The tanks were still not coated as of April 2010 or March 2012. (Docket Nos. 178 at p. 178; 179 at p. 44.) In light of that evidence, the Court finds: (1) that the drydock's wastage depicted and described at trial occurred progressively, (2) that the wastage existed in April 2011 when SJT applied for insurance with Catlin, and (3) that at the very least, Mr. Payne and SJT ought to have known about the wastage. As discussed below, the Court finds that Mr. Payne indeed had actual knowledge of the wastage, but despite that knowledge, SJT failed to communicate anything regarding the drydock's condition to Catlin.

Mr. Payne's knowledge of the drydock's poor condition is evidenced by his conversation with Mr. Thompson of CSL North America. In April 2010, Mr. Payne and Mr. Thompson inspected the *Perseverence* in connection with a claim for hull damage presented to RLI. (Docket 178 at pp. 171–72; Trial Ex. QQQQ.) Mr. Thompson's report was submitted into evidence, and he testified at trial regarding his conversations with Mr. Payne about the inspection. *Id.* The report reflects that Mr. Payne had attempted to claim damages for "various internals in way of the #3 port compartment" as related to the April 16, 2010 incident, but that following the inspection, "[Mr. Payne] agreed that those damages were pre-existing and unrelated to the incident." (Trial Ex. QQQQ.) Mr. Thompson's testimony confirms that the "pre-existing damages" included in the report specifically referred to the wasted condition of the drydock's steel. (Docket 178 at p. 171.) Finding Mr. Thompson's testimony credible, the Court concludes that Mr. Payne knew of the drydock's wastage as of April 2010.

It appears from Mr. Toscani's, Mr. Payne's, and Mr. Kirchhofer's testimony that Mr. Payne never provided information regarding the drydock's wastage to his insurance broker, and in turn, Mr. Toscani did not communicate that information to Catlin. In fact, Mr. Kirchhofer testified that Mr. Toscani gave *no* indication as to the drydock's condition during their discussions regarding SJT's insurance submission. Mr. Kirchhofer explained that in the absence of any disclosure of information regarding the drydock's condition by the insured or the broker, he "assumed[,] and it was implied[,] that there was no serious issue with the condition of the drydock." (Docket 178 at p. 74.) Based on his communications with Mr. Toscani, Mr. Kirchhofer understood that Catlin would be underwriting a drydock that was up for sale, a port risk, and nonoperational—circumstances that overall represent "a lesser risk to underwriters." *Id.* at 99–100. Catlin, therefore, "felt no need[, and] there was no cause of alarm[,] to order a [condition and valuation] survey [of the drydock]." *Id.* at 100. While the Court questions the soundness of Mr. Kirchhofer's decision not to request updated condition and value information or a survey,[10] the doctrine of *uberrimae fidei* places the burden on the *insured* to disclose all material information regarding the risk to the insurer. The evidence in the record shows that SJT failed to meet that burden. Accordingly, the Policy must be void *ab initio*.

## C. Failure to Disclose RLI's Cancellation For Loss History

Catlin submits that a third ground for voiding the Policy exists, because SJT failed to disclose that SJT's previous policy with RLI was cancelled due to loss history. Given Mr. Kirchhofer's history with SJT's account at RLI, the Court declines to adopt that conclusion. Mr. Kirchhofer originally underwrote the drydock in 2006 and handled the account "several times" throughout his employment at RLI. (Docket 178 at p. 75.) Defendant SJT offered several exhibits at trial demonstrating that Mr. Kirchhofer received emails regarding SJT's claims on the drydock as well as emails identifying the SJT policy as one that had claims "with more than $25,000 loss reserves." (*See* Trial Exs. BBB–0000.) It is reasonable to assume, therefore, that Mr. Kirchhofer already understood the loss history of the *Perseverence,* and that factored into Mr. Kirchhofer's evaluation of the risk when underwriting Catlin's Policy.[11]

The Court cannot extend that assumption, however, to also find that Mr. Kirchhofer fully understood the *risk* of insuring the *Perseverence,* including the drydock's value and condition. Mr. Kirchhofer's deposition reveals that he thought he "had familiarity with the risk." (Docket 141–2 at pp. 6–7.) Because Mr. Payne was withholding information regarding the value and condition of the drydock, what Mr. Kirchhofer *thought* he knew about the *Perseverence*'s risk in April 2011 was actually incorrect. Although information about loss history is material to an evaluation of the risk, it is sufficiently distinct from the material facts of value and condition. Accordingly, the Court finds the Policy to be void *ab initio* due to SJT's over-valuation of the *Perseverence* as well as SJT's failure to disclose the true condition of the drydock, but not for allegedly withholding in-

---

10. At the very least, the Court regards Mr. Kirchhofer's due diligence on SJT's account as not thorough and imprudent, and conceivably even *strategic* so that Catlin could later void the Policy should a large—and thus unprofitable—claim arise.

11. Indeed, Mr. Kirchhofer admitted that he did not ask Mr. Toscani about the loss history of the drydock. (Docket 141–2 at pp. 6–7.)

formation that RLI had cancelled SJT's policy due to loss history.

### III. Conclusion

For the reasons discussed above, the Court finds that SJT violated the doctrine of *uberrimae fidei* when it applied for insurance with Catlin because it (1) overvalued the *Perseverence,* and (2) failed to disclose an accurate description of the condition of the drydock. Accordingly, the Ocean Marine Insurance Policy No. HLO–3464–0411 between Catlin and SJT is void *ab initio.*

In accordance with this Memorandum and the Opinion and Order at Docket No. 157, judgment is entered **GRANTING** Catlin's first and second causes of action and **DISMISSING WITH PREJUDICE** all of Catlin's alternative causes of action in Case No. 11–2093. All of SJT's claims originally filed in Case No. 11–2116 and amended in Case No. 11–2093 are **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED.**