IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 26, 2021 Session

## DAVID HUGHES ET AL. v. THE LIBERTY MUTUAL FIRE INSURANCE COMPANY

**Appeal from the Circuit Court for Blount County**
**No. L-18333  David Reed Duggan, Judge**

———————————————————

**No. E2020-00225-COA-R3-CV**

———————————————————

The driver of a vehicle covered by a general automobile liability policy notified the insurance carrier of a potential uninsured motorist claim. The insurance carrier responded that the named insured had rejected in writing uninsured motorist coverage for vehicles in use in Tennessee. The driver claimed that the prior rejection was no longer effective because the named insured had submitted a new application during the renewal process. After a bench trial, the court ruled that the policy did not include uninsured motorist coverage. We conclude that the prior written rejection remained in effect when the policy was renewed. And because the named insured did not submit a new application in connection with the renewal transaction, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which KRISTI M. DAVIS, J., joined. D. MICHAEL SWINEY, C.J., not participating.

Wayne A. Ritchie II, James R. Stovall, and Samantha I. Ellis, Knoxville, Tennessee, for the appellants, Dana Hughes and David Hughes.

Melissa A. Maravich and Sarah E. Stuart, Memphis, Tennessee, for the appellee, Liberty Mutual Fire Insurance Co.

# OPINION

## I.

### A.

On April 19, 2012, Mr. David Hughes was injured in an automobile accident. The vehicle Mr. Hughes was driving was covered by a business automobile liability policy issued by Liberty Mutual Fire Insurance Company to Health Management Associations, Inc. ("HMA"). Mr. Hughes filed a personal injury action against the other driver and notified Liberty Mutual of a potential uninsured motorist claim. *See* Tenn. Code Ann. § 56-7-1206 (2016). Liberty Mutual paid for the physical damage to the automobile. But the insurer denied that the policy included uninsured motorist coverage.

HMA owned, leased, and managed hospitals throughout the United States. The company originally purchased the business automobile policy in 2001. The policy was renewed, with substantially the same terms and coverage, each year for the next eleven years.[1]

The policy provided comprehensive fleet coverage. It broadly defined "named insured" to include both HMA and all its subsidiaries, including those companies acquired during the policy term. And any additional vehicles acquired by a named insured during the policy term were automatically covered. The exact number of motor vehicles covered during a policy period was never finalized until the end of the term. After a final fleet audit, Liberty Mutual adjusted the premium as necessary.

As part of the yearly renewal process, HMA's insurance broker provided Liberty Mutual with the necessary information for the insurer to underwrite the account and determine the initial premium for the upcoming year. This information typically included a current fleet list as well as information on any changes in the company.

By the first annual renewal in 2002, HMA had acquired assets, including motor vehicles, in Tennessee. Robert Farnham, on behalf of HMA, rejected uninsured motorist coverage for vehicles in use in Tennessee in a written document, signed and dated on November 12, 2002. Mr. Farnham executed a new written rejection for Tennessee vehicles each succeeding year through 2010.

---

[1] The policy's liability limits were increased to $2,000,000.00 as of October 1, 2002. Over the years, HMA also expanded operations into additional states. These location changes required additional state-specific endorsements.

The renewal policy at issue here was effective from October 1, 2011, to October 1, 2012. With the renewal deadline approaching,[2] Marsh USA, Inc., HMA's insurance broker, took the HMA account "to market." According to Sean Mitchell, a placement representative at Marsh, it is customary in the insurance industry to take large commercial accounts "to market" every three to five years. While a broker may take this action for a variety of reasons, here the goal was financial. By soliciting premium quotes for the HMA account from a variety of insurance carriers, including Liberty Mutual, the broker hoped to obtain a better overall financial package for HMA.

At that time, HMA operated 59 hospitals in 15 states. And the company was in negotiations with Mercy Health Partners, Inc. to purchase an additional seven hospitals and related assets in Tennessee. The anticipated purchase included 113 motor vehicles in Tennessee. The parties tentatively scheduled a closing for October 1, 2011—the same day the existing policy term ended.

On August 18, 2011, Mr. Mitchell sent an email on behalf of HMA to multiple insurance companies, including Liberty Mutual, soliciting premium quotes for the upcoming year. As the timing of the Mercy Health acquisition remained uncertain, Mr. Mitchell asked each carrier to quote the coverage with and without the Mercy Health assets. The email included detailed information about HMA, its subsidiaries, its current fleet, and the pending acquisition. It also specified the desired coverage. The submission did not request uninsured motorist coverage for vehicles in use in Tennessee.

On September 30, Mr. Mitchell notified Liberty Mutual that HMA had chosen to renew its coverage for another term. The renewal policy contained identical terms and liability limits as in the previous year. The only changes were financial. The overall initial premium increased although the per vehicle rate was lower. And Liberty Mutual waived the collateral requirement.

Also consistent with previous years, the 2011 renewal policy did not expressly include uninsured motorist coverage for vehicles in use in Tennessee. Elizabeth Orr, HMA's manager of insurance, explained at trial that the company waived uninsured motorist coverage whenever possible. Daniel Dunne, the Liberty Mutual executive assigned to the HMA account, echoed that sentiment. He had worked with HMA since 2002. In his experience, HMA had always waived uninsured motorist coverage when allowed to do so. And he did not recall anyone at HMA or Marsh seeking a change in coverage for the 2011 policy year.

---

[2] HMA had two insurance policies with Liberty Mutual—one provided workers' compensation coverage and the other covered its commercial fleet. Both policies had the same renewal cycle. In terms of premium and losses, the worker's compensation policy was "by far the biggest line of coverage."

The Mercy Health acquisition closed on October 1, 2011.  After the closing, the renewed policy covered 119 vehicles in Tennessee, including the vehicle driven by Mr. Hughes.  HMA did not execute a new written rejection of uninsured motorist coverage for Tennessee vehicles in connection with the 2011 renewal.  But Mr. Farnham had specifically rejected uninsured motorist coverage for all Tennessee vehicles in a writing dated November 15, 2010.  In that written rejection, he indicated that he understood "that the coverage selection and limit choices indicated here will apply to all future policy renewals, continuations, and changes unless I notify you otherwise in writing."

B.

The court held a bench trial to determine whether the 2011 policy included uninsured motorist coverage for vehicles in use in Tennessee.  It was undisputed that HMA properly rejected uninsured motorist coverage for its Tennessee vehicles in 2010.  *See id*. § 56-7-1201(a)(2) (2016).  And HMA never subsequently requested such coverage.  But Mr. Hughes claimed that the 2010 written rejection was no longer effective because HMA had submitted a new application in connection with the 2011 renewal.  *See id.* Unsurprisingly, Liberty Mutual disagreed.  The insurance company viewed the August 2011 submission as an ordinary renewal packet, not a new application.

Most insurance carriers, including Liberty Mutual, do not require a specific application form for large commercial accounts.  Large companies send information packets including a "description of who they are and what they do" and "a cadre of exposure schedules . . . , along with historical loss information."  The submission is the application.

As Mr. Mitchell explained, the August submission contained "the information needed for [an] insurance carrier to quote the business."  He sent the same information to all the insurance carriers.  He agreed that the submission was an application.  But he could not say whether it was "new."  As he phrased it, "we don't term things 'new' . . . from an application standpoint."

Three insurance experts testified for Mr. Hughes—William Daley, David Cunningham, and James Mahurin.  They unanimously agreed that the August submission was a new application.  But there was no consensus as to why.  Two experts based their opinions on the submission's level of detail.  To them, while a certain amount of information was routinely submitted in connection with a renewal transaction, the August submission was more comprehensive than a typical renewal packet.  The third expert emphasized the pending Mercy Health acquisition.  In his view, only the part of the submission that included the Mercy Health assets could be called a new application.  The Mercy Health assets were not covered by a previous policy term.  They were new exposures for this account.

4

But Mr. Dunne at Liberty Mutual saw nothing new in the August submission. Acquisitions were commonplace with the HMA account. HMA submitted updated information with every renewal. The insurer needed relevant updates and information on new exposures for underwriting the upcoming year.

Richard Mintzer, Liberty Mutual's expert witness, acknowledged that the August submission could be called an application. But he also saw nothing new in the submission. It included "new exposures" but not "new business." Liberty Mutual already insured similar exposures for HMA. The size and level of detail in the submission did not make it "new." In his opinion, the extensive detail was simply a byproduct of the broker's marketing effort.

All the experts agreed that it was up to Liberty Mutual to decide whether to issue a renewal policy or a new separate policy. And, as Mr. Dunne pointed out, the 2011 policy was clearly marked as a renewal policy. According to the policy declarations, it was a renewal of a policy originally issued in 2001. And HMA's automobile coverage had essentially remained the same since its inception.

## C.

After a detailed analysis of the proof at trial, the trial court concluded that no new application had been submitted in connection with the 2011 renewal. The policy terms gave HMA the right to acquire new assets with the assurance that the new assets would be automatically covered. Liberty Mutual had no choice but to extend coverage to newly-acquired motor vehicles during the policy term, subject to a revised premium. The court found that the timing of the Mercy Health acquisition "was pure coincidence" and thus had no bearing on its decision. And the court credited Mr. Mintzer's testimony that the extensive detail in the email submission was part of the marketing process, not a sign of something new.

The court assigned no weight to the "collective expert opinion that the August submission was an insurance application." Viewing an application as a request for coverage, the court reasoned that a request, by definition, "may be turned down." Here, because Liberty Mutual had not sent the statutorily-required notice of non-renewal, the insurer had no choice but to renew coverage. *See id*. § 56-7-1805(a) (2016). Under these circumstances, the email submission could not be deemed an application. And the 2010 rejection remained in effect.

In the alternative, the court ruled that, even if the August submission was a new application submitted in connection with a renewal, the statutory requirements for rejecting uninsured motorist coverage had been satisfied. The court found HMA's specific request for uninsured motorist coverage only in South Carolina and West Virginia was tantamount to a rejection of such coverage in Tennessee. The rejection was in writing, and it was

5

signed by a Marsh representative. The court found "overwhelming evidence" that Marsh acted as HMA's agent in submitting the August email.

The court rejected Mr. Hughes's argument that Marsh could not be HMA's agent, as a matter of law, in light of the producer statute. *See id.* § 56-6-115(b) (2016).[3] The court highlighted the inconsistency in Mr. Hughes's position that Marsh could be deemed HMA's agent for purposes of whether the submission was a new application for insurance but not for purposes of whether the application rejected uninsured motorist coverage. Common sense and fundamental fairness precluded the court from accepting such an argument. Besides, the court noted, the producer statute did not "affect the apparent authority of an agent." *See id.*

## II.

Mr. Hughes challenges both of the trial court's holdings. He argues that the trial court erred in concluding that no new application was submitted in connection with the 2011 renewal transaction. He also contends that the court erred in ruling that the August submission effectively rejected uninsured motorist coverage in Tennessee. As we find his first issue dispositive, we do not address his challenges to the trial court's alternate ruling.

Whether the facts established in the trial court "satisfy the statutory standard" is a mixed question of law and fact. *See Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19, (1982) (A mixed question of law and fact is a "question[] in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated."). Cases "that involve mixed questions of law and fact are subject to de novo review." *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

### A.

According to Mr. Hughes, the court's conclusion was based on an erroneous premise. The court ruled that Liberty Mutual had no choice but to renew the policy. As Mr. Hughes points out, the business automobile policy did not provide for an automatic

---

[3] The statute provides, in relevant part,

An insurance producer who solicits or negotiates an application for insurance shall be regarded, in any controversy arising from the application for insurance or any policy issued in connection with the application between the insured or insured's beneficiary and the insurer, as the agent of the insurer and not the insured or insured's beneficiary. This subsection (b) shall not affect the apparent authority of an agent.

Tenn. Code Ann. § 56-6-115(b).

renewal. Mr. Dunne acknowledged at trial that Liberty Mutual could have chosen not to renew the policy. It only had to give the requisite notice.

By statute, an insurer must provide an insured with "notice of its intention not to renew [a] commercial risk policy." *See* Tenn. Code Ann. § 56-7-1805(a). And unless the insurer provides this notice "at least sixty (60) days in advance of the end of the policy period, . . . the insurer is required to extend the existing policy sixty (60) days from the date the notice is provided." *Id.*

Mr. Hughes is correct. The statute did not require Liberty Mutual to issue a renewal policy. The insurer could have refused to renew coverage as long as it provided the necessary amount of notice. The statute merely required the insurer to extend the existing policy for the specified period.

Even so, the trial court's misapprehension of the notice statute does not merit reversal of its decision. *See* TENN. R. APP. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). As explained below, we conclude that HMA did not submit a new application in connection with the 2011 renewal.

B.

Every general automobile liability policy issued or renewed in Tennessee must include uninsured motorist coverage unless such coverage has been validly rejected by the named insured. *Id.* § 56-7-1201(a), (a)(2). The effectiveness of a named insured's waiver of uninsured motorist coverage is governed by subsection (a)(2):

> However, any named insured may reject in writing the uninsured motorist coverage completely or select lower limits of the coverage but not less than the minimum coverage limits in § 55-12-107. Any document signed by the named insured or legal representative that initially rejects the coverage or selects lower limits shall be binding upon every insured to whom the policy applies, and shall be conclusively presumed to become a part of the policy or contract when issued or delivered, regardless of whether physically attached to the policy or contract. Unless the named insured subsequently requests the coverage in writing, the rejected coverage need not be included in or supplemental to any continuation, renewal, reinstatement, or replacement of the policy, or the transfer of vehicles insured under the policy, where the named insured had rejected the coverage in connection with a policy previously issued by the same insurer; **provided, that whenever a new application is submitted in connection with any renewal, reinstatement**

7

> **or replacement transaction, this section shall apply in the same manner as when a new policy is being issued.**

*Id.* § 56-7-1201(a)(2) (emphasis added).

Without question, this was a renewal policy. And an insurer need not include uninsured motorist coverage in a renewal policy when a signed, written rejection by the named insured remains in effect. *Id.* But a prior written rejection loses its effectiveness "whenever a new application is submitted in connection with any renewal . . . transaction." *Id.*

Mr. Hughes maintains that the trial court failed to give the words in the statute their plain meaning. In his view, "new application" means a recent request. *See Application*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining application as "[a] request or petition"); *New*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "new" as "recently come into being"). And in the insurance industry, an "application" is a request for a premium quote. *See Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc.*, 979 F. Supp. 2d 181, 183 (D.P.R. 2013), *aff'd as modified sub nom. Catlin at Lloyd's v. San Juan Towing & Marine*, 778 F.3d 69 (1st Cir. 2015) (defining "application" as "a request from a broker to an underwriter for a coverage quote on a particular risk."); *Smith v. N.H. Indem. Co.*, 60 So. 3d 429, 432 (Fla. Dist. Ct. App. 2011) ("An application in the context of insurance is, by definition, a request for coverage."). Putting these definitions together, he contends that a new application is submitted in connection with a renewal transaction whenever the named insured submits "information to request a premium quote for a new policy term."

We recognize that dictionary definitions can be helpful in discerning the natural and ordinary meaning of the words used in a statute. *See State v. Majors*, 318 S.W.3d 850, 859 (Tenn. 2010). But "the meaning of individual words in a statute does not equal the meaning of the statute itself." *Waldschmidt v. Reassure Am. Life Ins. Co.*, 271 S.W.3d 173, 177 n.2 (Tenn. 2008). Context is important. *See Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010) ("[B]ecause . . . words are known by the company they keep, courts must also construe these words in the context in which they appear in the statute and in light of the statute's general purpose."). And here, the statute differentiates between standard renewals and renewal transactions in which the insured has submitted a new application.

Nothing about the August 2011 submission distinguished it from the typical renewal process between these parties. HMA submitted information about changes within the company and the company fleet as part of every renewal. Liberty Mutual used this information to finalize the premium for the policy term that was ending and to determine a premium for the upcoming year.

8

Still, Mr. Hughes claims that HMA submitted much more detailed information than a typical renewal and requested a coverage quote for new exposures. The trial court found that the size of the submission was due solely to the marketing decision. The evidence does not preponderate against that finding. Mr. Mitchell provided the same underwriting materials both to the incumbent carrier and other insurance carriers unfamiliar with the HMA account.

And the timing of the Mercy Health closing "was pure coincidence." As Mr. Hughes conceded at trial, if the Mercy Health acquisition had closed on any other date, the newly-acquired assets would have automatically been covered by an existing policy. Coverage for new acquisitions—whether large or small—was automatic, subject to a premium adjustment.

Mr. Hughes does not contend that HMA requested any coverage changes or new policy terms in the August submission. Since 2002, HMA's fleet coverage had remained essentially the same. The 2011 renewal policy was no different. The only changes Mr. Hughes has identified in the 2011 policy are the effective dates and the initial premium—both of which changed on a yearly basis.

Finally, Mr. Hughes argues that the pre-renewal negotiations between the parties indicate that this was not a standard renewal. According to Mr. Hughes, the 2011 renewal was "a complete re-application, re-evaluation, and re-negotiation of HMA's account for the 2011-12 policy year." But we do not equate marketing tactics with a complete renegotiation of the policy terms. As noted above, nothing changed here but the price.

In sum, HMA properly rejected uninsured motorist coverage for its motor vehicles in use in Tennessee. The company did not request uninsured motorist coverage in Tennessee for the 2011 policy term. And the August submission, while comprehensive, requested the same coverage and policy terms that HMA had enjoyed since 2002. Because HMA did not submit a new application in connection with the 2011 renewal transaction, the company's previous written rejection remained in effect for the renewal policy. The 2011 business automobile policy did not provide uninsured motorist coverage for vehicles in use in Tennessee.

## III.

We affirm. The 2011 renewal policy did not include uninsured motorist coverage. HMA rejected such coverage for its vehicles in use in Tennessee. And the company did not submit a new application in connection with the 2011 renewal transaction.

_s/ W. Neal McBrayer_

W. NEAL MᴄBRAYER, JUDGE