# United States Court of Appeals
## For the First Circuit

No. 13-2491

CATLIN (SYNDICATE 2003) AT LLOYD'S,

Plaintiff, Appellee,

v.

SAN JUAN TOWING AND MARINE SERVICES, INC.,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta,
Circuit Judges.

Manuel Sosa-Báez, with whom Ian P. Carvajal and Saldaña, Carvajal & Vélez-Rivé, P.S.C., were on brief, for appellant.
James W. Carbin, with whom P. Ryan McElduff and Duane Morris LLP, were on brief, for appellee.

February 6, 2015

**TORRUELLA, Circuit Judge.** This is an appeal from a decision of the United States District Court for the District of Puerto Rico sitting in admiralty. The trial involved a maritime insurance policy issued by Appellee Catlin (Syndicate 2003) at Lloyd's ("Catlin"), to cover the floating drydock[1] PERSEVERANCE owned by Appellant San Juan Towing and Marine Services ("SJT"), a ship repair company based in San Juan, Puerto Rico. At trial, the district court concluded that the insurance policy was void <u>ab initio</u> by reason of SJT's violation of the doctrine of <u>uberrimae fidei</u> in its application for the policy.[2] <u>See</u> <u>Catlin (Syndicate</u>

---

[1]  A "floating drydock" is a floating structure that can be partially submerged to a predetermined depth by flooding its ballast tanks. After a ship to be repaired is docked into position on the partially submerged structure, the structure, with the ship aboard, is refloated by pumping the water out of the ballast tanks until the pontoon deck is clear of water, and then the repairs can be performed on the ship.  This is distinguishable from what is commonly referred to as a <u>graving drydock</u>, which is a permanently fixed, land-based basin with entrance enclosures constructed at or near the water's edge, into which, when the basin is filled with water, a ship enters.  After the entrance enclosures are closed, the basin is pumped dry of water, exposing the underwater portions of the vessel's hull to be repaired or worked on.  <u>See</u> <u>O'Leary</u> v. <u>Puget Sound Bridge & Dry Dock Co.</u>, 349 F.2d 571, 573 (9th Cir. 1965)(quoting the Department of the Navy, Bureau of Yards and Docks); <u>see also</u> <u>JML Trading Corp</u>. v. <u>Marine Salvage Corp.</u>, 501 F. Supp. 323, 325 n.2 (E.D.N.Y. 1980);  <u>Md. Cas. Co.</u> v. <u>Lawson</u>, 101 F.2d 732, 733 (5th Cir. 1939) ("A floating dock receives a vessel when the dock is submerged, after which the watertight compartments of the dock are pumped out and the buoyancy of the dock raises the vessel.")

[2]  <u>Uberrimae fidei</u> means roughly "utmost good faith."  <u>See</u> <u>Black's Law Dictionary</u> 1754 (10th ed. 2014); <u>see also</u> <u>Grande</u> v. <u>St. Paul Fire & Marine Ins. Co.</u>, 436 F.3d 277, 282 (1st Cir. 2006).  Under this doctrine, the insured in a maritime insurance contract is required "to disclose to the insurer all known circumstances that

2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc., 979 F. Supp. 2d 181, 186 (D.P.R. 2013) ("Catlin IV"). The district court erred in deeming the contract void ab initio; rather, we find that it was voidable. We therefore affirm, albeit with a minor modification of the lower court's holding to reflect this correction.

## I. Background

### A. Factual History

In 2006, SJT retained the services of Marine Consultants, Inc. ("Marine Consultants") to perform a condition and valuation survey of the floating drydock PERSEVERANCE. In that survey, which was dated April 17, 2006, the PERSEVERANCE was valued at $1,500,000. Thereafter, on August 27, 2006, SJT purchased the PERSEVERANCE for $1,050,000. Subsequently, SJT made improvements to the floating drydock, modifying it so that it could be towed from Louisiana to Puerto Rico. Marine Consultants then issued another condition and valuation report on November 21, 2006, in which it valued the floating drydock at $1,750,000. This $250,000 increase in value from the first report to the second was the result of the value added to the floating drydock due to the

---

materially affect the insurer's risk, the default of which . . . renders the insurance contract voidable by the insurer." Windsor Mount Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 54-55 (1st Cir. 1995); accord Black's Law Dictionary (10th ed. 2014) 808 (defining utmost good faith as "[t]he state of mind of a party to a contract who will freely and candidly disclose any information that might influence the other party's decision to enter into the contract").

improvements and modifications that allowed the PERSEVERANCE to be towed to Puerto Rico.

By 2009, and as late as 2011, due to declining business and increasing financial distress, SJT was actively trying to sell the PERSEVERANCE. SJT had initially advertised the sale price in 2009 as $1,350,000. In February 2010, SJT advertised the floating drydock for sale in Boats & Harbors -- a marine industry publication -- for $1,350,000. During January 2011, SJT continued to advertise the PERSEVERANCE for sale at $1,350,000. On January 3, 2011, a potential buyer offered to purchase the floating drydock for $700,000. As negotiations progressed throughout the month, SJT lowered the PERSEVERANCE's purchase price to $850,000, and eventually, on January 29, 2011, to $800,000. That potential buyer ultimately did not consummate the purchase.

In April 2011, SJT again advertised the PERSEVERANCE for sale in Boats & Harbors. This time the asking price was $800,000. Five months later, on September 4, 2011, SJT agreed to sell the PERSEVERANCE to Leevac Shipyards ("Leevac"), a Louisiana-based company, and on September 19, 2011, SJT signed a purchase-and-sale agreement in which it accepted Leevac's offer to purchase the floating drydock for $700,000. The deal later fell through.

Between August 2006 and February 2011, SJT insured the PERSEVERANCE with the RLI Insurance Company ("RLI"), with a declared hull value of the PERSEVERANCE under this policy of

-4-

$1,750,000, presumably based on the second Marine Consultants condition and valuation report dated on November 21, 2006. In February 2011, RLI cancelled the drydock's insurance policy, cryptically stating "Loss History"[3] as the reason for said action.

Thereafter, at SJT's request, SJT's insurance broker, John Toscani ("Toscani"), who was located in New York, approached Catlin seeking, through Lloyd's, a marine insurance policy "consisting of hull, [protection and indemnity], ship repairs, general liability and contractor's equipment" (emphasis added). SJT's broker represented that the PERSEVERANCE's prior insurance coverage was for $1,750,000, but did not provide Catlin with a copy of RLI's notice of cancellation. The parties agree that SJT did not provide additional representations suggesting that this was the actual value of the PERSEVERANCE, and Catlin's representative, Mr. Kirchhofer, testified that he did not ask for more information on the floating drydock's value or condition, but rather assumed that the value was in line with that number. Most importantly, SJT also did not disclose information regarding substantial, preexisting damage to the PERSEVERANCE's hull, which had been evident since at least April 2010.

---

[3]  A loss history reflects the decline in value of an asset due to some kind of adverse event (e.g., vandalism or a natural disaster). Loss histories are often included in loss history reports or similar documentation, allowing insurers to verify the condition of the property more efficiently.

Thereafter, the Catlin policy -- the Ocean Marine Insurance Policy (the "Policy") -- became effective in April 2011, with a total insurable value of $1,840,000. The Policy, however, contained an endorsement that modified its terms to list the insured value at $1,750,000, the same stated amount in the previous RLI policy. Additionally, the total limit of liability for each loss occurrence was set at $1,000,000.

On September 28, 2011, the PERSEVERANCE was berthed at Pier 15, in San Juan, Puerto Rico. At the direction of Mark Payne ("Payne"), one of SJT's principals, the floating drydock was ballasted[4] for the purpose of performing maintenance on parts of the hull. Payne instructed the repairmen to add ballast water to the floating drydock's stern compartments to allow access to the forward sections to be repaired. Thereafter, Payne left the PERSEVERANCE'S berthing area on personal business. At approximately 3:30 p.m., before he left for the day, SJT foreman José Monge gave instructions to the repairmen to pick up and shut off the water hose that was still filling at least one of the floating drydock's ballast tanks.

Late that evening, SJT tug Captain Padilla ("Padilla") returned to Pier 15 after a towing assignment and found the

---

[4] See supra note 1. The act of ballasting involves pumping water into the floating drydock's "ballast tanks," which are empty when the boat is fully afloat and thus keep the drydock buoyant. Pumping water into the tanks reduces the buoyancy of the drydock, causing it to ride lower in the water.

PERSEVERANCE with its aft section completely underwater and its forward part awash. Padilla proceeded to call Payne on his cell phone to inform him of the dire situation the PERSEVERANCE was in, but ten minutes later, at about midnight, called him again to inform him of the total sinking of the PERSEVERANCE. Payne arrived shortly thereafter and, together with Padilla, observed that a fire hose connected to a water main on the dock was still pumping water into the sunken drydock, with the valve on shore still in an open position. Payne proceeded to shut the valve, which was easily seen and accessible to anyone who wished to turn off the flow of water.

Refloating the PERSEVERANCE turned out to be a challenging process, taking nearly one month to complete. After being refloated, the PERSEVERANCE was inspected and the damage assessed by expert marine surveyors. The surveyors found the underside of the floating drydock to be substantially rusted and decayed, the existence of which SJT had known about but failed to disclose to Catlin when it sought coverage under the Policy. This damage explained why refloating the PERSEVERANCE -- a drydock that was designed specifically to be able to submerge and refloat using its ballast tanks -- had been so difficult. During the month of December 2012, the drydock was sold for scrap for $40,000.00.

SJT proceeded to file a claim with Catlin, alleging the total loss of the PERSEVERANCE, in the amount of $1,750,000. Catlin denied this claim, relying on the discrepancy between the

amount the PERSEVERANCE was insured for according to the Endorsement ($1,750,000) and its actual market value (approximately $700,000 to $800,000), as evidenced by the sale price advertised to potential buyers around the time when SJT sought the quote for the Policy.

## B.  Procedural History

To afford a better understanding of the final resolution of this appeal, we deem it appropriate to include a résumé of the procedural history of this case before the district court.  On November 8, 2011, Catlin filed a declaratory judgement complaint against SJT, invoking both admiralty (28 U.S.C. § 1333) and diversity (28 U.S.C. § 1332) jurisdiction.  Catlin alleged eight admiralty or maritime claims and sought to void the Policy pursuant to the doctrine of <u>uberrimae fidei</u>.  In turn, SJT filed a separate diversity suit against Catlin, demanding recovery for the full insured value of $1,750,000 under the Policy for the loss of the PERSEVERANCE.  Catlin counterclaimed and the cases were consolidated.

### 1.  <u>Catlin I</u>

On April 8, 2013, the district court granted SJT's motion for partial summary judgment and dismissed without prejudice the claim brought by Catlin, concluding that under the recently decided case of <u>Lozman</u> v. <u>City of Riviera Beach</u>, 133 S. Ct. 735 (2013), the court lacked admiralty jurisdiction over this controversy because

the PERSEVERANCE was not a "vessel."[5]  See Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs, Inc., Civil Nos. 11-2093 (FAB); 11-2116 (FAB), 2013 U.S. Dist. LEXIS 52307, at *37-38 (D.P.R. Apr. 8, 2013) ("Catlin I").  This ruling was based on the court's determination that the PERSEVERANCE did not meet the Lozman test for determining whether a floating structure was a "vessel" for admiralty jurisdiction purposes because "a reasonable observer, looking to the PERSEVERANCE's physical characteristics and activities, would not consider it to be designed to any practical degree for carrying people or things on water."  Id. at *37.

### 2. Catlin II

On May 13, 2013, the district court entertained a motion for reconsideration of its ruling in Catlin I. Although the court continued to adhere to its finding that the PERSEVERANCE failed to meet the Lozman standard as to what constitutes a vessel for the purposes of admiralty jurisdiction, it nevertheless concluded that admiralty jurisdiction was present because the central issue of the controversy concerned a maritime contract -- i.e., the Policy -- the "primary objective" of which was "essentially maritime [in] nature" and "relates to navigation, business or commerce of the sea." Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing &

---

[5]   In so ruling, the district court rejected the Report and Recommendation issued by the magistrate judge, who had found (prior to the announcement of the new Lozman test) that the PERSEVERANCE was a "vessel."

Marine Servs., Inc., 946 F. Supp. 2d 256, 260 (D.P.R. 2013) ("Catlin II"); see also Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd., 543 U.S. 14, 24-25 (2004). It also ruled that Catlin's complaint properly pleaded diversity jurisdiction and found diversity to be an alternate ground for the exercise of federal jurisdiction, even if not in admiralty. See Catlin II, 946 F. Supp. 2d at 267.

### 3. Catlin III

On July 30, 2013, the district court once again opined on the dispute, this time regarding the outstanding motions for summary judgment filed by Catlin and SJT, respectively. Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc., 974 F. Supp. 2d 64 (D.P.R. 2013) ("Catlin III"). In substance, the court concluded that notwithstanding its finding that the PERSEVERANCE was not a "vessel," federal admiralty jurisdiction and law did attach to this controversy because the interpretation of a maritime contract was at issue (as per Catlin II). Id. at 74-76. Furthermore, the district court held that the doctrine of uberrimae fidei's representation and disclosure requirements together constituted an "entrenched federal precedent" that would apply to this case if the facts alleged by Catlin were proven to be correct. Id. at 75-76. The court, however, was unable to decide the merits of these contentions because there were factual matters in dispute that needed to be resolved in a trial

and not via summary judgment. Id. at 79-80. In ruling on the question as to the risks covered by the Policy, an alternate issue raised by Catlin's denial of coverage, the district court found that the Policy was an "all risk insurance policy," as contended by SJT. Id. at 83. Summary judgment, however, could not be entered on behalf of SJT on this issue because there were factual issues in dispute as to whether the PERSEVERANCE sank due to "fortuitous circumstance[s] or casualty . . . covered under the all risk policy." Id. at 84. These outstanding factual issues needed to be resolved through a trial.

### 4. Catlin IV

On October 8, 2013, after a bench trial, the district court resolved the merits of this controversy. See Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc., 979 F. Supp. 2d 181, 191 (D.P.R. 2013) ("Catlin IV"). Having already ruled in Catlin III that uberrimae fidei was an entrenched doctrine governing maritime insurance contracts, the court made findings of fact in support of its eventual conclusion that SJT had failed to comply with the doctrine of uberrimae fidei in its application for the Policy, and was therefore barred from recovery thereunder. Id. at 186-191.

### II. Discussion

The application of the doctrine of uberrimae fidei to this controversy (as decided in Catlin III), which in modern

American jurisprudence is extant only in the context of maritime insurance,[6] depends on the outcome of the central issue raised by SJT both here and below: whether Puerto Rico's Insurance Code, P.R. Laws Ann. tit. 26, §§ 1101 et seq. ("the Code"), is the controlling substantive law in this controversy rather than general federal maritime law.  SJT contends that Section 1110 of the Code contains specific provisions that address the issue of whether representations made during negotiations to obtain insurance coverage affect an insured's ability to collect on a policy.  SJT alleges that these statutory provisions contravene and prevail over the doctrine of uberrimae fidei pursuant to the Jones Act of 1917 ("Jones Act"), 48 U.S.C. § 749,[7] and our holding in Guerrido v. Alcoa S.S. Co., 234 F.2d 349, 355 (1st Cir. 1956).  We conclude, based on our de novo review, that it does not.

_____

[6]  See Giragosian, 57 F.3d at 54 n.3 ("The sole remaining vestige of the doctrine is in maritime insurance."); Thomas J. Schoenbaum, The Duty of Utmost Good Faith in Marine Insurance Law: A Comparative Analysis of American and English Law, 29 J. Mar. L. & Com. 1, 39 (1998).  At one time, good faith was a requirement of general contract law.  See generally Eric M. Holmes, A Contextual Study of Commercial Code Faith: Good-Faith Disclosure in Contract Formation, 39 U. Pitt. L. Rev. 381 (1978) (providing an analysis of the historical development of the concept of good faith).

[7]  The Jones Act granted U.S. citizenship to the people of Puerto Rico and established a "civil government" with a locally-elected legislative branch.  39 Stat. 951.  Various statutory provisions of the Jones Act were repealed or amended with the enactment of the Puerto Rican Federal Relations Act of 1950 ("PRFRA"), which remains extant law today.  See 48 U.S.C. §§ 731-916.  Furthermore, the PRFRA authorized the people of Puerto Rico to organize a government pursuant to a constitution of their own adoption, but subject to Congressional approval.  Id. § 731(a)-(d).

**A. Does Federal Admiralty Law Apply to this Controversy?**

As a general rule, in the absence of established and governing federal admiralty law, the states have largely unfettered power to regulate matters related to marine insurance. See Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 321 (1955) ("We, like Congress, leave the regulation of marine insurance where it has been -- with the States."); Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006) ("Generally, in cases involving a marine insurance contract, we will apply state law . . . .").

Under Sections 7 and 8 of the Jones Act, now codified at 48 U.S.C. §§ 747-749, because Puerto Rico has control over its harbors and navigable waters, we are required to treat Puerto Rico like a state. However, in the absence of a federal statute expressly made applicable to Puerto Rico, Sections 8, 9, and 37[8] of the Jones Act grant Puerto Rico more power to legislate in the admiralty and maritime field than if it were a state, insofar as the act authorizes inconsistent Puerto Rico laws. 48 U.S.C. § 749, 821.[9] Moreover, this Court has held that:

---

[8]  The PRFRA repealed the last paragraph of Section 37 of the Jones Act, which dealt with local legislative authority to create executive departments

[9]  Section 8 of the Jones Act, 48 U.S.C. § 749 states in relevant part:
   All laws of the United States for the protection and improvement of the navigable waters of the United States and the preservation of the interests of navigation and

-13-

> [T]he rules of admiralty and maritime law of the United States are presently in force in the navigable waters of the United States in and around the island of Puerto Rico to the extent that they are not locally inapplicable either because they were not designed to apply to Puerto Rican waters or because they have been rendered inapplicable to these waters by inconsistent Puerto Rican legislation.

Guerrido, 234 F.2d at 355.  The exercise of that power by Puerto Rico can have the effect of rendering conflicting non-statutory federal maritime law "locally inapplicable."  Id.

SJT contends that Section 1110 of the Code should be deemed to be the kind of conflicting local legislation that can render inapplicable non-statutory admiralty law, including the doctrine of uberrimae fidei.  Section 1110 states:

> All statements and descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties.  Misrepresentations, omissions, concealment of acts, and incorrect statements shall not prevent a recovery under the policy unless:
> (1) Fraudulent; or
> (2) material either to the acceptance of the risk, or to the hazard assumed by the insurer; or
> (3) the insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the

---

commerce, except as so far as the same may be locally inapplicable, shall apply to said island and waters and to its adjacent islands and waters.

-14-

> insurer as required either by application for the policy or otherwise.
>
> When the applicant incurs in any of the actions enumerated in subsections (1), (2), and (3) of this section, recovery shall only be prevented if such actions or omissions contributed to the loss that gave rise to the action.

P.R. Laws Ann. tit. 26, § 1110. Therefore, SJT urges us to apply the more favorable Section 1110, in lieu of the stricter <u>uberrimae fidei</u> doctrine.

We disagree with SJT's contention. This provision is not relevant to the present case because the applicability provision of the Code, Section 1101, expressly excludes ocean marine insurance from the ambit of the Code. Section 1101 states:

> (1)The applicable provisions of this chapter [i.e. Chapter 11] shall apply to insurances <u>other than ocean marine . . . insurance[] as defined in subsection (2) . . . .</u>
> (2)For the purposes of subsection (1) of this section and this title, '<u>ocean marine... insurance[]' shall include only:</u>
>      (a)Insurances upon vessels, <u>crafts, hulls</u>, and of interests therein or with relation thereto.
>      (b)Insurance of <u>marine builders' risks</u> . . . .

<u>See</u> P.R. Laws Ann. tit. 26, § 1101 (emphasis added). This Court has previously ruled that in enacting this provision, Puerto Rico intended "to exclude maritime insurance contracts from [the] statutory provisions [in the Code] governing the interpretation and construction of insurance contracts." <u>Lloyd's of London</u> v. <u>Pagán-</u>

Sánchez, 539 F.3d 19, 25 (1st Cir. 2008); see also Reifer-Mapp v. 7 Maris, Inc., 830 F. Supp. 72, 76 (D.P.R. 1993).

It is exactly the kind of coverage described in Section 1101 of the Code that was provided to SJT by Catlin in the Policy:

> Coverage: Hull, Protection & Indemnity including Collision & Towers Liability, Marine General Liability including Ship Repairers Liability, Equipment . . . .

(emphasis added). Therefore, there can be no doubt that the Policy is an ocean marine insurance policy within the meaning of Section 1101, because the PERSEVERANCE is a "craft" and/or a "hull," and the Policy covers maritime interests and risks. As previously stated, the Policy was procured for SJT by Toscani, who "placed a package policy consisting of hull, P&I, ship repairs, legal, general liability and contractors equipment" (emphasis added), with Catlin. Indeed, Toscani admitted that he considered the Policy to be a marine insurance policy. It contained Endorsement 5 ("Drydock"), which provided coverage for the PERSEVERANCE, and specifically identified the perils insured against as principally those related to the seas and related maritime risks:

> TOUCHING THE ADVENTURES AND PERILS which we, the said Assurers, are contended to bear and take upon us, they are of the Seas, Rivers, Lakes, Harbours, . . . or other causes of whatsoever nature arising either on shore or otherwise, causing Loss of or injury to the Property hereby insured, and of all other Perils, Losses, and Misfortunes that have or shall have come to the Hurt, Detriment, or Damage of the said Dock . . . or any part thereof.

-16-

The district court's findings regarding the PERSEVERANCE support the conclusion that the Policy covered a structure within the ocean marine insurance exception to the Code:

> The Perseverance consisted of a horizontal platform called a pontoon, which measured 150 feet long, 70 feet wide, and 5 feet tall. It had a superstructure -- its "wingwalls" -- which consisted of two vertical elements 120 feet long, four feet wide, and sixteen feet tall. The top of the port wingwall was fitted with one semi-sheltered steel control room. The Perseverance had a raked bow and two tow pads to connect it to a towing vessel, and according to Payne [SJT's marine manager], "[t]he drydock was specially outfitted and prepared for the voyage to San Juan [from Louisiana, of approximately 2000 miles]. Upon arrival in San Juan, most of the Perseverance's temporary modifications [including wire towing cable, towing chains, emergency retrieving line, emergency drag rope, emergency tow wire, and all emergency tow wire attachment clips] required for navigation, except for the raked bow, were removed and were not replaced. Additional modifications of the dry dock were then made, including the "installation of two steel gangways, shore power cable, a pneumatic manifold and an electrical distribution panel."

Catlin I, 2013 U.S. Dist. LEXIS 52307, at *6-8.[10] Further factual findings by the court help to support this conclusion:

> The Perseverance was secured and attached to the southwestern end of the outfitting Pier 15 in Miramar, a location that was adjacent to an apron designed by the Puerto Rico Ports Authority ("Ports Authority") for rental

---

[10] These findings were adopted by the district court as part of its findings in Catlin IV; they are not challenged on appeal. See Catlin IV, 979 F. Supp. 2d at 182 n.1.

to . . . SJT. The area occupied by . . . SJT contained mooring lines, support equipment and machinery, grounding connection, electricity, and compressed air. At the pier, the _Perseverance_ received electrical power from generators located on shore . . . when needed. A shoreside pneumatic line fed compressed air to the dry dock, and the wing wall was connected directly to a grounding lug on the pier with a three-quarter-inch grounding wire. At least one gangway -- chained both to the dry dock and the pier -- provided access to the _Perseverance_, which was tied to the dock with more than ten three-inch-diameter mooring lines and numerous spring lines. . . .

At the time that it sank, the _Perseverance_ . . . had been non-operational for almost a year. Between the time it arrived in 2007 and when it sank in 2011, the dry dock was occasionally moved ten or fifteen feet within its assigned area at the pier. The movement [was] done for the purpose of returning the dry dock back to its original position after raising and repairing a vessel, and was accomplished by the use of ropes pulled by either harbor workers or a pickup truck.

_Id._ at 8-9.

Finally, based on the evidence presented, the district court found as follows: "The _Perseverance_ was designed, constructed, and used to provide marine maintenance and repair services to vessels," and "[i]ts intended use [was] to lift floating equipment for inspection and repair." _Id._

We again note that the Policy expressly included "hull" coverage for the PERSEVERANCE. At a minimum, the description of the PERSEVERANCE adopted by the trial court, and previously described, is undoubtedly encompassed within the term "hull" as

-18-

used in Section 1101's definition of ocean marine insurance under the Code.  See David Auburn et al., Oxford American Writer's Thesaurus 442 (1st ed. 2004) (listing "structure" as one synonym of "hull").[11]

Not to be ignored is the obvious fact that we are dealing with a floating structure, at least one that should be floating

_____

[11] The question of whether a maritime structure is a vessel, craft or hull under section 1101 of the Code is, of course, a question of Puerto Rico law, not federal law.  However, in the only case in which the Puerto Rico Supreme Court has interpreted the relevant sections of the insurance code, to which SJT points in support of their argument, the court turned to federal law in general, and the federal law of admiralty in particular, as a source of guidance. See Quiñones v. G. Amer. Ins. Co., 97 D.P.R. 368 (1969); see also Hernández v. S.S. Mut. Underwriting Ass'n, Ltd., 388 F. Supp. 312 (D.P.R. 1974) (interpreting the Puerto Rico Insurance Code solely via federal law).  Accordingly, we do likewise.
    While the term "hull" is ill-defined in federal admiralty law, in contrast to "vessel," which has been the subject of extensive and ongoing discussion, it is nonetheless clear that the term is applicable to a structure such as the PERSEVERENCE.  See Eric Sullivan, The Marine Encyclopaedic Dictionary 209 (5th ed. 1996) (defining a hull as the "[s]hell or body of a ship"). Interestingly, the origin of this nautical term appears to be botanical:

> **hull** [OE] The notion underlying the word hull is of 'covering' or 'concealing.' It originally meant 'peapod' – etymologically , the 'covering' of peas – and comes ultimately from the same Indo-European source as produced English cell, clandestine, conceal, hall, hell, and possibly colour and holster. It is generally assumed that hull 'main body of a ship,' which first appeared in the 15th century, is the same word (a ship's hull resembling an open peapod), although some etymologists have suggested that it may be connected with hollow.

John Ayoto, Dictionary of Word Origins 289 (1990).  As a floating drydock unquestionably has the form of a shell afloat in the water, it can be aptly described as a hull.

-19-

under normal conditions, even when partly flooded to take on a ship in need of repairs. It is difficult to countenance the existence of a structure that not only floats on pontoons, performs essential maritime repair work on the water, and is capable of being towed (and in fact has been towed thousands of miles on the open ocean) without concluding that it is a "hull" or a "craft."

We need to discuss one final argument raised by SJT before entering into a discussion of the merits of whether the uberrimae fidei doctrine applies to this controversy: namely, SJT's contention that the controlling definition for what constitutes "marine and transportation insurance" is contained in Section 405 of Code, and not Section 1101. See P.R. Laws Ann. tit. 26 § 405. According to SJT, because Section 405(d) "includ[es] dry docks" as one of the structures covered by Section 405's definition of "marine insurance," the Policy in this case, which covers a floating drydock, is not within the ocean marine insurance exclusion contained in Section 1101. See id. Thus, SJT alleges Section 405 bars application of uberrimae fidei.

There are at least two fundamental reasons why SJT's argument on this issue is flawed. The first is that a plain reading of Section 1101 clearly establishes that the controlling definition for the entire Code as to what is marine insurance is found in that section of the Code. Section 1101(2) specifically states that for "purposes of subsection (1) of this section [which

-20-

establishes the exclusion of ocean marine insurance from application of the Code] and this title, 'ocean marine . . . insurances' shall include only: (a) Insurances upon vessels, crafts, hulls, and of interests therein or with relation thereto." P.R. Laws Ann. tit. 26, § 1101 (emphasis added). That definition supercedes all other conflicting language in Title 26, of which Section 405 is a part, even assuming there is such a conflict.

The second point is that there is no such conflict because the "dry docks" referred to in Section 405(1)(d) are totally different structures than the floating drydock involved in the present case. All the utilities referred to in Section 405(1)(d) are fixed, land-based structures, e.g., "piers, wharves, docks and slips, and other aids to navigation and transportation, including dry dock and marine railways, dams and appurtenant facilities for the control of waterways." No legislative intent is discernible from this language to support the conclusion that we should include a movable, floating structure within that fixed, land-based conglomerate. Thus, Section 405 does not have any bearing on floating drydocks.[12]

In the present case, there is no local legislation that is "inconsistent" with federal admiralty law. Thus, based on the meaning of the terms craft and hull, the factual findings of the

---

[12] See note 1, supra, for the distinction between floating and fixed dry docks.

district court as to the PERSEVERANCE's structure and function, the language of the Policy and the circumstances surrounding its procurement, and the clear dictate of Section 1101, the Policy is expressly excluded from the ambit of the Code by the "carve out" delimited in Section 1101.

## B. Is Uberrimae Fidei an Entrenched Precept of Federal Admiralty Law Applicable to this Controversy?

Presented twice with this issue previously, we have not yet taken an authoritative stance on whether uberrimae fidei is an established rule of maritime law. See Pesante, 459 F.3d at 38 ("While we have never actually decided the issue, it is true that we have questioned whether uberrimae fidei is an established rule of maritime law."); Giragosian, 57 F.3d at 54 n.3 ("[I]t is debatable whether the doctrine can still be deemed an 'entrenched' rule of law."). The question of whether a doctrine is an established rule of maritime law, though seemingly abstruse, is of vital importance in admiralty cases as it can prove to be dispositive in controversies such as the dispute at hand. This is because for marine insurance contract cases, we only apply federal maritime rules that are established and settled; otherwise we would look to state law. See Pesante, 459 F.3d at 37; Giragosian, 57 F.3d at 54.

Marine insurance is vital to the adequate flow of commerce. The nature of the risks that are covered by maritime insurance is such that, given the urgent necessity for the

-22-

placement of this type of insurance coverage that is often present in the business of maritime commerce, as well as the extreme distances that often separate the insurance seeker and the insurer, it is imperative that the insurer be provided with truthful and valid information about the risk the insurer is asked to undertake by the party most able to provide such data: the insured.

Although this court had not yet held definitively that uberrimae fidei is an established rule of maritime law, we do so now, thus joining the near-unanimous consensus of our sister circuits,[13] ruling without further equivocation that the doctrine of uberrimae fidei is an established rule of maritime law in this Circuit.[14] This ruling should hardly be surprising. As early as

---

[13]  See, e.g., N.Y. Marine & Gen. Ins. Co. v. Cont'l Cement Co., LLC, 761 F.3d 830, 839 (8th Cir. 2014) (recognizing that uberrimae fidei is "established federal precedent"); AGF Marine Aviation & Transp. v. Cassin, 544 F.3d 255, 263 (3d Cir. 2008) (same); Certain Underwriters at Lloyd's, London v. Inlet Fisheries Inc., 518 F.3d 645, 650-54 (9th Cir. 2008) (same); HIH Marine Servs., Inc. v. Fraser, 211 F.3d 1359, 1362 (11th Cir. 2000) (same); Puritan Ins. Co. v. Eagle S.S. Co. S.A., 779 F.2d 866, 870 (2d Cir. 1985) (same). The Fifth Circuit is alone in holding that uberrimae fidei is "not entrenched federal precedent." Albany Ins. Co. v. Anh Thi Kieu, 927 F.2d 882, 889 (5th Cir. 1991) (internal quotation marks omitted). This view, however, has been heavily criticized. See, e.g., Inlet Fisheries Inc., 518 F.3d at 652-54 (disparaging the Anh Thi Kieu decision as logically flawed and concluding that it "does violence" to established law).

[14]  Our adoption of uberrimae fidei does not violate the Supreme Court's warning in Wilburn Boat Co., 348 U.S. at 316, not to create new admiralty rules that govern marine insurance policies. See Inlet Fisheries Inc., 518 F.3d at 650-51 ("[T]he Supreme Court in Wilburn Boat expressed a reluctance for federal courts to fashion new admiralty rules, not a desire to do away with existing ones."). Uberrimae fidei is a judicially created admiralty rule that

-23-

1828, the Supreme Court characterized an insurance contract as "a contract <u>uberrimae fidei</u>."  <u>McLanahan</u> v. <u>Universal Ins. Co.</u>, 26 U.S. 170, 185 (1828).  In fact, 100 years later, "the doctrine was referred to as a 'traditional' aspect of insurance law."[15]  <u>N.Y. Marine & Gen. Ins. Co.</u>, 761 F.3d at 839 (quoting <u>Stipcich</u> v. <u>Metro. Life Ins. Co.</u>, 277 U.S. 311, 316 (1928)).  Even following the Supreme Court's <u>Wilburn Boat Co.</u> decision in 1955, which held that states should have the primary say in matters of marine insurance, 348 U.S. at 321, the circuit courts –- including the Fifth Circuit prior to its <u>Anh Thi Kieu</u> decision in 1991 –- routinely applied <u>uberrimae fidei</u> as a federal admiralty rule to marine insurance contracts because it was so well-established.  <u>See</u> <u>Inlet Fisheries Inc.</u>, 518 F.3d at 651-52 (citing, <u>e.g.</u>, <u>Ingersoll Milling Mach. Co.</u> v. <u>M/V Bodena</u>, 829 F.2d 293, 308 (2d Cir. 1987); <u>Fireman's Fund Ins. Co.</u> v. <u>Wilburn Boat Co.</u>, 300 F.2d 631, 646 (5th Cir. 1962) (on remand from the Supreme Court)).

---

substantially predates <u>Wilburn Boat Co.</u> and has been reapplied time and time again even after the <u>Wilburn Boat Co.</u> decision.  <u>See</u>, <u>e.g.</u>, <u>Inlet Fisheries Inc.</u>, 518 F.3d at 653 (observing that <u>uberrimae fidei</u> is a 200-year-old rule); <u>see also</u> <u>McLanahan</u> v. <u>Universal Ins. Co.</u>, 26 U.S. 170, 185 (1828) (discussing <u>uberrimae fidei</u> in the context of insurance).

[15]  As one commentator has put it, "'no rule of marine insurance is better established tha[n] the utmost good faith rule.'"  <u>Inlet Fisheries Inc.</u>, 518 F.3d at 653-54 (alteration in original) (quoting Thomas J. Schoenbaum, <u>The Duty of Utmost Good Faith in Marine Insurance Law: A Comparative Analysis of American and English Law</u>, 29 J. Mar. L. & Com. 1, 11 (1998)).

Then, in 1991, the Fifth Circuit held in Anh Thi Kieu that uberrimae fidei was not established maritime law, a decision that the Ninth Circuit has characterized as an "abrupt[] change[] [in] course". Id. at 652 (referencing Anh Thi Kieu, 927 F.2d at 889-90). "Ironically, were it not for the Anh Thi Kieu decision itself, there would be little cause at all to doubt that uberrimae fidei is indeed firmly entrenched maritime law." Id.

We find it instructive that following our 2006 decision in Pesante, in which we questioned whether uberrimae fidei was an established rule of maritime law, 459 F.3d at 38, three of our sister circuits -- the Third Circuit in 2008, the Ninth Circuit in 2008, and the Eighth Circuit in 2014 -- formally recognized the doctrine as established admiralty law. See N.Y. Marine & Gen. Ins. Co., 761 F.3d at 839; AGF Marine Aviation & Transp., 544 F.3d at 263; Inlet Fisheries Inc., 518 F.3d at 654. Moreover, the Second and Eleventh Circuits -- courts that have recognized uberrimae fidei as an established maritime rule since at least the 1980s[16] -- have recently reaffirmed the vitality of uberrimae fidei within their respective jurisdictions. See, e.g., St. Paul Fire & Marine Ins. Co. v. Matrix Posh, LLC, 507 F. App'x 94, 95 (2d Cir. 2013); I.T.N. Consolidators, Inc. v. N. Marine Underwriters Ltd., 464 F. App'x 788, 790 n.3 (11th Cir. 2012) (per curiam). Therefore, based

---

[16] See Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2d Cir. 1986); Steelmet, Inc. v. Caribe Towing Corp., 747 F.2d 689, 695 (11th Cir. 1984).

on both the policy rationales supporting <u>uberrimae fidei</u> and the longstanding history and consistent application of the doctrine by most of the circuits, we formally recognize <u>uberrimae fidei</u> as an established admiralty rule within this Circuit.

## C. Did SJT Violate <u>Uberrimae Fidei</u>?

We finally proceed to an analysis of the application of <u>uberrimae fidei</u> to this case.[17]  At the bench trial, Richard Thompson ("Thompson"), a hull inspector who surveyed the PERSEVERANCE, testified that he found "heavy wastage" in the drydock's hull during an April 2010 inspection.  After Thompson notified SJT of the rust and deterioration problems, SJT admitted that "those damages were pre-existing."  Because the PERSEVERANCE was not in prime condition and business was slow, SJT offered to sell the floating drydock to potential buyers at a price between $700,000 to $800,000, which presumably approximated its actual value at the time.  Indeed, in April 2011 -- the same month that the Catlin Policy took effect -- SJT advertised the PERSEVERANCE for sale at a price of $800,000.  Yet, SJT, in its request for marine insurance coverage from Catlin, represented to Catlin that the PERSEVERANCE had been previously insured by RLI for $1,750,000

---

[17]  Our standards of review for a bench trial are well known; the district court's factual findings are protected by clear error review.  <u>Giragosian</u>, 57 F.3d at 53.

-- $700,000 <u>more</u> than what SJT paid for the drydock originally.[18] We agree with the district court that Catlin could have reasonably assumed the value presented to it in the previous insurance policy from RLI as the actual value and evaluated its risks based on the conditions it would have reasonably expected from a drydock of that value. SJT's failure to disclose the true value of the PERSEVERANCE, what SJT paid for the PERSEVERENCE, and the PERSEVERANCE's level of deterioration, therefore, are all material facts, the nondisclosure of which violates <u>uberrimae fidei</u>. <u>See</u> <u>N.H. Ins. Co.</u> v. <u>C'Est Moi, Inc.</u>, 519 F.3d 937, 939 (9th Cir. 2008) ("The purchase price of a vessel is unquestionably a fact material to the risk, as it provides an objective measure of the vessel's worth and the corresponding risk of insuring the vessel." (internal quotation marks and citation omitted)); <u>Pesante</u>, 459 F.3d at 38 (explaining that a material fact is "that which can possibly influence the mind of a prudent and intelligent insurer in determining whether it will accept [a] risk" (internal quotation marks omitted)); <u>Grande</u>, 436 F.3d at 283 ("[T]he strict maritime

---

[18] It is true that the second Marine Consultants report valued the PERSEVERANCE at $1,750,000 in November 2006, due to the value added by the improvements made to the ship to prepare it for towing. Yet continuing to represent this amount as the drydock's actual value more than four years later fails to account for subsequent depreciation, damage, and decay, particularly in the absence of further major improvements to the vessel. Moreover, we find no error in drawing an inference that the drydock's advertised sale price of $800,000 in April 2011 better approximated the actual value of the PERSEVERENCE than an outdated valuation report from four years earlier.

rule of uberrimae fidei [provides that] an insured must make full disclosure of all material facts of which the insured has, or ought to have, knowledge . . . even though no inquiry be made." (last alteration in original) (internal quotation marks omitted)).

Under uberrimae fidei, when the marine insured fails to disclose to the marine insurer all circumstances known to it and unknown to the insurer which "materially affect the insurer's risk," the insurer may void the marine insurance policy at its option. Giragosian, 57 F.3d at 55. In other words, the policy becomes voidable.[19] See id. at 54-55. As discussed above, the evidence conclusively shows that SJT failed to disclose material information about the PERSEVERENCE's actual value and preexisting

---

[19] The district court concluded that under uberrimae fidei, the Policy was void ab initio, meaning that there was never an enforceable contract to begin with. See Black's Law Dictionary 1805 (10th ed. 2014). However, as the Supreme Court has described it, and as we conclude now, uberrimae fidei renders a marine insurance contract voidable –- the contract is deemed valid until being voided at the election of the insurer. See, e.g., Stipcich, 277 U.S. at 316 ("Insurance policies are traditionally contracts uberrimae fidei and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option."). Moreover, our prior cases that did not adopt uberrimae fidei as well-established law also describe the doctrine as one that renders an insurance contract voidable, not void ab initio. See, e.g., Pesante, 459 F.3d at 38 ("[I]f we were to find that the doctrine of uberrimae fidei is an established rule of maritime law, we would hold that the policy was voidable as a matter of law.").

deteriorated condition prior to Catlin determining whether it would accept the risk.  Catlin was free, therefore, to void the policy.[20]

### III.  Conclusion

SJT violated the doctrine of _uberrimae fidei_ in its procurement of the Policy.  Thus, Catlin was entitled to void the Policy.  The decision of the district court is affirmed, however, its holding is modified to reflect that the contract was voidable, not void _ab initio_.

**Affirmed.**

---

[20]  One might argue that there is a distinction between an insurance policy that pays the insured amount versus an insurance policy that pays the actual value in the event of a total loss of the drydock, and the facts in this case are not clear as to whether Catlin would have paid up to the liability limit ($1,000,000) or the market value (approximately $700,000 to $800,000, based on the prices at which SJT was willing to sell the vessel).  However, this question is immaterial, as _uberrimae fidei_ looks solely to whether SJT satisfied its duty of disclosing all material facts known to it. Regardless of the factual uncertainty in this respect, we find that SJT violated _uberrimae fidei_ under either set of circumstances. Clearly, in the first scenario, in which Catlin owed the full liability limit of $1,000,000 in the event of total loss, then the actual value of the PERSEVERANCE would be a material fact, the nondisclosure of which would violate _uberrimae fidei_.  See _Cassin_, 544 F.3d at 265; _N.H. Ins. Co._, 519 F.3d at 939.  As to the second scenario, had Catlin known that the PERSEVERANCE was being offered for sale at less than forty-six percent of its insured value, it, like any reasonable insurer, likely would not have agreed to issue the $1,750,000 insurance policy in the first place.  See, _e.g._, _Pesante_, 459 F.3d at 38.

-29-